STATE OF NORTH CAROLINA v. JOHN QUINTON SHANK

No. 734A86

(Filed 5 May 1988)

**Criminal Law § 50.1; Homicide § 18.1— first degree murder—effect of diminished mental capacity on premeditation and deliberation—expert testimony excluded —error**

> The trial court erred in a first degree murder prosecution in which de-fendant did not plead insanity by not allowing defendant's expert to testify that in his opinion defendant's diminished mental capacity affected his ability to make and carry out plans or to testify as to whether he determined defend-ant was under the influence of mental or emotional disturbance at the time of the offense. Testimony tending to show that defendant did not have the capaci-ty to premeditate or deliberate was relevant in determining the presence or absence of an element of the offense with which defendant was charged; N.C.G.S. § 8C-1, Rule 704 now allows opinion testimony even though it relates to an ultimate issue; and the testimony is not inadmissible under any other Rule of Evidence.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) (1986) from a judgment imposing a sentence of life imprisonment en-tered by *Williams, J.,* upon defendant's conviction of first degree murder at the 15 September 1986 Criminal Session of Superior Court, CLEVELAND County. Heard in the Supreme Court 10 No-vember 1987.

*Lacy H. Thornburg, Attorney General, by Charles M. Hen-sey, Special Deputy Attorney General,* for the State.

*Malcolm Ray Hunter, Jr., Appellate Defender,* for defendant-appellant.

WHICHARD, Justice.

Defendant was convicted of the first degree murder of Della-ree Shank and sentenced to life imprisonment. We award a new trial.

The State's evidence tended to show that on 6 January 1986, between 8:30 and 9:00 a.m., defendant went to the Cleveland County Health Department, where his estranged wife, Dellaree Shank, worked. Defendant and Ms. Shank walked out of the build-ing into the parking lot. They talked for a short time, then de-fendant pulled out a gun. As Ms. Shank ran away screaming,

defendant shot her. She fell to the pavement. Defendant walked up to her and shot her several more times. Then defendant got in a truck and drove away. The State Medical Examiner testified that Ms. Shank's body had five gunshot wounds.

At about 9:15 a.m., defendant called his brother, Clifford Shank, and told him that he had done "something stupid," that he had "shot Dellaree." Clifford left his work in Kings Mountain and drove toward Shelby. He picked up defendant near a shopping center on Highway 74. Defendant told Clifford that he had shot Dellaree because she "wouldn't leave [him] alone." He asked Clifford to drive him to Clover, South Carolina. Clifford told defendant that he needed to get back to work, and he dropped defendant off at a shopping center in Gastonia. Defendant was subsequently arrested.

Later that day, police discovered a gun and holster in a bedroom in the house of Carolyn Lawrence, defendant's girlfriend. The gun had recently been fired. The State introduced evidence that defendant had borrowed a pistol and ammunition from a friend on 2 January 1986, and had bought a shoulder holster from a gun shop on 4 January 1986.

Defendant testified in his own behalf. He stated that he and Ms. Shank were married in 1978, divorced in 1981, and remarried in 1984. They had two children from these marriages. In September or October 1985, he and Ms. Shank separated. He quit his job in Shelby and moved to Arizona, taking the children with him. Ms. Shank got a court order for custody. Police came to defendant's house, got the children, and took them back to North Carolina to Ms. Shank. Defendant returned to this state and filed suit for custody. While the suit was pending, he looked for a job. When he could not find work, he became depressed. He started to drink heavily, used cocaine and "speed," and lost thirty pounds in two months. He and Ms. Shank had continuing arguments about custody. He borrowed a gun for protection and for target shooting, but he also considered committing suicide with it. On 4 January he was supposed to visit the children, but Ms. Shank refused to let his mother pick them up.

Defendant further testified that on 6 January 1986, after only an hour and a half of sleep, he went to his grandmother's house, smoked two marijuana cigarettes, then went to the Health De-

partment to find out why Ms. Shank had not let him visit with the children two days earlier. He asked her to go outside to talk. Once outside, they started arguing about her refusal to let him see the children. She told him that no matter what he did, she would make sure that he would never get to see the children again. Defendant testified that he did not remember anything from that time until the time he was arrested.

Defendant did not contend at trial that he was insane when he shot Ms. Shank. However, he attempted to show that at the time of the shooting he was suffering from mental disorders which rendered him incapable of premeditating and deliberating. The trial court allowed defendant to introduce expert testimony that at the time he shot Ms. Shank he was suffering from "psychogenic amnesia."

Dr. John Billinsky, defendant's expert in forensic psychiatry, testified that at the time of the shooting defendant was suffering from "psychogenic amnesia, adjustment reaction with mixed disturbance of emotions and conduct . . ., mixed substance abuse episodic and marital problems." Dr. Billinsky testified that defendant suffered from severe depression in the days and weeks immediately preceding the killing. Defendant drank heavily; he used marijuana, cocaine, and amphetamines; he had "obsessive concerns about the children and about getting back with the children"; and he thought seriously about committing suicide. Dr. Billinsky said that on the morning of 6 January 1986, defendant was suffering from an overwhelming amount of stress. Ms. Shank's threat never to let him see his children again caused defendant to experience intense emotional arousal, resulting in amnesia. Dr. Billinsky also testified that defendant may have had a dissociative episode at this time.

Dr. William Varley, defendant's expert in psychology and psychological testing, testified that he had done a psychological evaluation of defendant on 17 June 1986. He said that the information he obtained through testing defendant and examining Dr. Billinsky's report supported Dr. Billinsky's diagnoses, and that he also believed defendant's period of amnesia was real.

As part of its rebuttal evidence, the State offered the testimony of Dr. Bob Rollins, an expert in forensic psychiatry, who had also examined defendant extensively. His opinion was that at

the time of the shooting defendant was suffering from "adjustment disorder with a mixed disturbance of emotions and conduct[,] . . . [m]ixed substance abuse episodic[,] . . . [a]nd marital maladjustment. . . ." He further testified that these disorders were not "so severe as to prevent [defendant] from understanding what he was doing and knowing that that would have been wrong."

The trial court did not allow defendant's expert to testify that, in his opinion, defendant's diminished mental capacity affected his ability to make and carry out plans. It also did not allow him to testify whether he determined that defendant was under the influence of mental or emotional disturbance at the time of the offense. Defendant assigns error to the court's refusal to allow this testimony. We hold that under the North Carolina Rules of Evidence, this was error which requires a new trial.

During *voir dire*, defense counsel related the anticipated testimony of Dr. Billinsky to the court. The following exchange occurred:

MR. SHUFORD [prosecutor]: Your Honor, would it be improper for me to conclude that he will not be permitted to testify specifically regarding how the mental state of this defendant on this date would affect his ability to perform [sic] an intent to kill?

THE COURT: I think that's fair.

MR. SHUFORD: All right.

When defense counsel then examined Dr. Billinsky on *voir dire*, the court said that it would sustain the prosecutor's objection to the following question:

Q. Doctor Billinsky, in view of the fact that you have stated you—in your opinion that his amnesia was real, would you have an opinion as to whether or not on January 6 he would have been able to plan his activities?

The court also stated:

Well, I think that the defendant is entitled to present evidence in the form of evaluations, in the form of an expert opinion concerning his evaluation by the psychiatrist, and I

would assume by Doctor Varley, who is a psychologist, as it relates to his emotional and mental state surrounding these events. The Court has indicated that it will not permit the psychologist or the psychiatrist in this case to render an ultimate opinion on the question of whether the defendant had the ability to form a specific intent to kill because I think that is a question of fact for the jury. However, the factors relevant to the jury making that determination may be elicited from this witness, short of him invading the province of the jury and rendering an opinion on the ultimate issue which the State has to establish, and that is the defendant did form the specific intent or he didn't. I think the jury is entitled to consider evidence from which they could reach the ultimate issue which they're asked to decide.

Upon direct examination of Dr. Billinsky before the jury, the court sustained the prosecutor's objections to the following questions:

Q. Do you have an opinion satisfactory to yourself as to whether on January the 6th, John Shank had the ability to make or carry out plans?

.   .   .

Q. Doctor Billinsky, I note that the order which ordered you to make this examination indicated that you were to determine whether the capital felony in question was committed while the defendant was under the influence of mental or emotional disturbance. Did you determine that?

In 1983, the General Assembly enacted the North Carolina Rules of Evidence, effective 1 July 1984. Rule 704 states that "[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." N.C.G.S. § 8C-1, Rule 704 (1986). This rule changed the former doctrine "that exclude[d] evidence in the form of an opinion if it purport[ed] to resolve the 'ultimate issue' to be decided by the trier of fact." N.C.G.S. § 8C-1, Rule 704 comment (1986). Since first degree murder requires premeditation and deliberation, *State v. Marshall*, 304 N.C. 167, 172, 282 S.E. 2d 422, 425 (1981), opinion testimony tending to show that a defendant did not have the capacity to premeditate or deliberate is testimony

that "embraces an ultimate issue to be decided by the trier of fact." N.C.G.S. § 8C-1, Rule 704 (1986). Under Rule 704, such testimony is not thereby rendered inadmissible.

While not all opinion evidence is admissible, "[g]enerally, all relevant evidence is admissible." *State v. Riddick*, 315 N.C. 749, 757, 340 S.E. 2d 55, 60 (1986) (citing Rule 402). Moreover, "[u]nder Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time." N.C.G.S. § 8C-1, Rule 704 advisory committee's note (1986).

Under Rule 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1986). To convict defendant of first degree murder, the State had to prove beyond a reasonable doubt that he killed with premeditation and deliberation. *State v. Propst*, 274 N.C. 62, 70, 161 S.E. 2d 560, 568 (1968). "Deliberation means an intent to kill, carried out in a cool state of blood in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *State v. Barts*, 316 N.C. 666, 687, 343 S.E. 2d 828, 842 (1986). Opinion testimony that defendant did not have the ability to "plan his activities" or "to make or carry out plans," and that he was under mental or emotional disturbance at the time he killed Ms. Shank, would tend to make it less probable that he acted after deliberation. *See State v. Riddick*, 315 N.C. at 757, 340 S.E. 2d at 60 (evidence of a defendant's state of mind at the time of the offense is a "fact of consequence to the determination of the action."). Such testimony is clearly relevant in a trial for first degree murder.

Rule 702, which deals with expert opinion testimony, provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert witness may testify thereto in the form of an opinion. N.C.G.S. § 8C-1, Rule 702 (1986). Testimony that a defendant was incapable of planning his activities or carrying out plans, and that he was under mental or emotional disturbance, could assist the jury in determining whether a defendant in fact premeditated and deliberated. Further, the probative value

of such testimony in this case clearly outweighed any possible confusion of the issues or concerns of delay. N.C.G.S. § 8C-1, Rule 403 (1986).

Because (1) testimony tending to show that defendant did not have the capacity to premeditate or deliberate was relevant in determining the presence or absence of an element of the offense with which he was charged, (2) Rule 704 now allows opinion testimony even though it relates to an ultimate issue, and (3) the testimony was not inadmissible under any other rule of evidence, the trial court erred in not allowing the testimony. We cannot say there is no "reasonable possibility that, had the error . . . not been committed, a different result would have been reached at the trial . . . ." N.C.G.S. § 15A-1443(a) (1983). The error thus is prejudicial and requires a new trial.

We note that North Carolina's Rule 704 is identical to the former Rule 704 of the Federal Rules of Evidence. In 1984, Congress amended Federal Rule 704, adding subsection (b). That subsection provides:

> (b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are for the trier of fact alone.

Fed. R. Evid. 704(b), *as added by* Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, 2067-68 (effective 12 Oct. 1984). In the absence of such a provision, North Carolina's Rule 704 plainly provides that an expert witness is not precluded from testifying as to whether a defendant had the capacity to make and carry out plans, or was under the influence of mental or emotional disturbance, merely because such testimony relates to an ultimate issue to be decided by the trier of fact.

Our decision is not inconsistent with *State v. Cooper*, 286 N.C. 549, 213 S.E. 2d 305 (1975). In *Cooper*, the defendant was charged with the murders of his wife and four of his children. A forensic psychiatrist testified at trial that Cooper suffered from paranoid schizophrenia and that he was unable to exercise the capacity to distinguish right from wrong at the time of the kill-

ings. The jury found that the defendant there was not legally insane at the time of the killings and convicted him of five counts of first degree murder. He received five life sentences. The defendant there contended before this Court that the trial court erred in failing to instruct the jury that it should consider evidence of his mental disease on the question of whether he premeditated and deliberated the killings. *Id.* at 565, 213 S.E. 2d at 316. The evidence there all related to a defense of insanity, however, not to the effect of the defendant's mental disease in negating his capacity to premeditate and deliberate. This Court held that there was no reversible error in the trial court's charge. *Id.* at 573, 213 S.E. 2d at 321.

*Cooper* and the cases following *Cooper*[1] are distinguishable from the case at hand. In those cases, the defendants presented their evidence of diminished mental capacity in support of a defense of not guilty by reason of insanity. Defendant here, by contrast, presented his evidence not to support an insanity defense—*i.e.* a defense of incapacity to distinguish between right and wrong at the time of and in respect to the offense, *id.* at 569, 213 S.E. 2d at 318—but to show a mental condition which could have been found to negate the capacity to premeditate and deliberate, evidence which we have herein held was proper under the new rules. Even in *Cooper,* a pre-Rules case, this Court recognized that such evidence would provide a proper basis for a not guilty verdict on a charge of first degree murder based on premeditation and deliberation. It stated:

> It is well established that to convict a defendant of murder in the first degree, when the killing was not perpetrated by one of the means specified by G.S. 14-17 and was not committed in the perpetration of or attempt to perpetrate a felony, the State must prove beyond a reasonable doubt that the killing was with premeditation and deliberation. It is also well established that a specific intent to kill is a necessary ingredient of premeditation and deliberation. *It*

1. *State v. Mize,* 315 N.C. 285, 337 S.E. 2d 562 (1985); *State v. Adcock,* 310 N.C. 1, 310 S.E. 2d 587 (1984); *State v. Franks,* 300 N.C. 1, 265 S.E. 2d 177 (1980); *State v. Harris,* 290 N.C. 718, 228 S.E. 2d 424 (1976); *State v. Hammonds,* 290 N.C. 1, 224 S.E. 2d 595 (1976); *State v. Shepherd,* 288 N.C. 346, 218 S.E. 2d 176 (1975); *State v. Wetmore,* 287 N.C. 344, 215 S.E. 2d 51 (1975), *death penalty vacated,* 428 U.S. 905 (1976); and other cases, if any.

*follows, necessarily, that a defendant who does not have the mental capacity to form an intent to kill, or to premeditate and deliberate upon the killing, cannot be lawfully convicted of murder in the first degree, whether such mental deficiency be due to a disease of the mind, intoxication, . . . or some other cause.*

*Id.* at 572, 213 S.E. 2d at 320 (emphasis supplied; citations omitted).

Insofar as *State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144 (1983), and *State v. Anderson*, 303 N.C. 185, 278 S.E. 2d 238 (1981), are inconsistent with this opinion, they are overruled. In those cases, the defendants, like defendant here, introduced evidence of mental disorders, not to support a defense of insanity, but to show that they did not have the capacity to premeditate and deliberate at the time of the killings.

For the foregoing reasons, we award defendant a new trial at which the court shall admit the evidence here held improperly excluded, if defendant again offers such evidence.

New trial.